```
 1                    IN THE UNITED STATES DISTRICT COURT

 2               FOR THE WESTERN DISTRICT OF MICHIGAN

 3                         SOUTHERN DIVISION

 4       UNITED STATES OF AMERICA,

 5            Plaintiff,              No.  1:22cr29-1/5

 6        vs.

 7       BRENDON GAGNE,
         JOSHUA FORD,
 8
              Defendants.
 9

10       Before:

11                       THE HONORABLE ROBERT J. JONKER,
                              U.S. District Judge
12                            Grand Rapids, Michigan
                              Tuesday, October 4, 2022
13                         Motion to Dismiss Proceedings

14       APPEARANCES:

15                  MR. MARK A. TOTTEN, U.S. ATTORNEY
                    By:  MS. STEPHANIE M. CAROWAN
16                  MR. JUSTIN MATTHEW PRESANT
                    330 Ionia Avenue, NW
17                  P.O. Box 208
                    Grand Rapids, MI 49501-0208
18                  (616) 808-2184

19                         On behalf of the Plaintiff;

20                  MS. BRITT MORTON COBB
                    Willey & Chamberlain LLP
21                  300 Ottawa Avenue, NW, Suite 810
                    Grand Rapids, MI 49503
22                  (616) 458-1158

23                         On behalf of Brendon Gagne.

24

25
```

```
 1              MR. GERALD J. GLEESON, II
                Miller Canfield Paddock & Stone PLC
 2              840 West Long Lake Road, Suite 150
                Troy, MI 48098
 3              (248) 267-3296

 4                      On behalf of Joshua Ford.

 5              Also Present:  Mark Markowski, PIS.

 6
         REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          10/04/2022

 2              (Proceedings, 2:59 p.m.)

 3              LAW CLERK:  The United States District Court for the

 4    Western District of Michigan.  The Honorable Robert J. Jonker,

 5    United States District Judge, presiding.

 6              THE COURT:  We're here on the case of the United

 7    States against Brendon Gagne and Joshua Ford, 1:22cr29.  We

 8    have motions on the calendar today, and let's start with

 9    appearances, please?

10              MS. CAROWAN:  Good afternoon, Your Honor.  Stephanie

11    Carowan and Justin Presant appearing on behalf of the United

12    States.  We are joined at counsel table this afternoon by

13    Special Agent Matt Markowski of the United States Postal

14    Inspection Service.

15              THE COURT:  All right.  Thank you.

16              MS. COBB:  And Good afternoon, Your Honor.  Britt Cobb

17    with my client, Brendon Gagne.

18              THE COURT:  Gagne.  I'm sorry.

19              MS. COBB:  No.  It's quite all right.  I did the exact

20    same thing.  I'm sure many people do, but it's nice to see you

21    this afternoon.

22              THE COURT:  All right.  Thank you.  Likewise.

23              MR. GLEESON:  Good afternoon, Your Honor.  Gerald

24    Gleeson on behalf of Mr. Ford, who is seated to my right.

25              THE COURT:  All right.  Thank you.  Welcome everybody.
```

1          So I have certainly read the briefing materials from

2     the parties.  I don't think there was any reply filed, so what

3     I have are the principal briefs from Ms. Cobb joined at least

4     as to Count 1 by counsel for Mr. Ford, and then the

5     government's response on all of it.  Anything else I should

6     have received from the government?

7          MS. CAROWAN:  No, Your Honor.

8          THE COURT:  Or from the Defense?

9          MS. COBB:  Not from Mr. Gagne.

10          MR. GLEESON:  Not for Mr. Ford, Your Honor.  Thank

11     you.

12          THE COURT:  All right.  Good.  Let me start out with

13     Ms. Cobb then, and give you a chance to summarize your

14     position, respond to anything you want from the government

15     brief and go from there.

16          MS. COBB:  Excellent.  Thank you, Your Honor.

17          I do have a few comments I would like to make as to

18     both counts.  I know that the Court will have read everything

19     and looked into it, so I certainly don't intend to go back over

20     what I've already written, but I do have some things I'd like

21     to say --

22          THE COURT:  Sure.

23          MS. COBB:  -- in reply to the government's papers.

24          THE COURT:  All right.

25          MS. COBB:  And I guess, I thought maybe I'd just start

1    out by letting the Court know kind of where we are coming from

2    with some of this material.

3         I think I have had a lot of questions about this case

4    from the outset.  Not from a conduct perspective.  The conduct

5    is relatively straightforward, and I know the Court has

6    presided over a lot of plea hearings and probably knows a lot

7    about the conduct.  And frankly, Mr. Gagne has given a couple

8    of statements to law enforcement.  So the conduct doesn't sort

9    of perplex me.  It's the government's legal theories and its

10   approach to kind of scope and sentencing issues that have been

11   perplexing.

12        As the Court can probably tell from our motion to

13   dismiss, we are perplexed, I think, in Count 1, which charges a

14   371 offense clause, conspiracy to smuggle based on regulatory

15   violations.  Sort of perplexing that's the charge, but the

16   government is wanting to cast this as this very, you know,

17   broad fraud, even though there is no intent to defraud alleged

18   in the indictment.

19        And then, of course, we are perplexed by in Count 2

20   with the government taking what appears to be in our view kind

21   of garden variety financial transactions that are part of the

22   smuggling conspiracy and calling it money laundering.

23        So the government's response to our motion probably

24   left me with more questions than it answered, and so I am

25   pleased that we are having this discussion today because

1   knowing the Court, I think that even if it doesn't end up

2   agreeing with us that the counts should be dismissed, perhaps

3   this discussion and the Court's findings on some of the legal

4   issues will help shape how -- you know, tell us how we should

5   be thinking about some of these things as we evaluate the

6   contours of a trial or plea and sentencing.

7          So with that, to address the smuggling count, what we

8   have alleged in our motion is that the offense in the

9   indictment -- that the indictment states in Count 1 basically

10  doesn't exist because misbranding of prescription drugs and

11  controlled substances occurs for not having a prescription

12  occurs kind of downstream after the articles have already been

13  shipped in interstate commerce while being held for sale, and

14  this is evident from the statutes that are cited in the

15  indictment.  Misbranding under 331 or not having a prescription

16  is contrary to 353(b)(1), which specifically states that drugs

17  dispensed without a prescription are deemed misbranded while

18  held for sale, and then made a violation of law under -- a

19  misdemeanor violation of law under 331(k), which says the same

20  thing, and adds that -- and specifies that they are misbranded

21  while held for sale after shipment in interstate commerce.

22         So the idea is that if the drugs are not misbranded

23  until they are held for sale the contrary to law provisions of

24  the smuggling statute, 545, can't be met, because the

25  misbranding violation does not occur at the time of the

1    importation.  And it's pretty clear, and I actually don't think

2    there seems to be any dispute from the government that the gist

3    of the smuggling offense is getting something into the country

4    illegally.  So there needs to be something illegal about the

5    importation itself, not the ultimate uses.

6         We read the 841 reference in the indictment to mean

7    that the conspiracy involved misbranded prescription drugs and

8    controlled substances.  We read that to mean that the

9    government was alleging that both were illegal for not having a

10   prescription because controlled drugs are -- they are subject

11   to the same misbranding rules as noncontrolled drugs.  I am

12   reading the government's papers in response to say, no, 841 is

13   in there because a smuggling conspiracy can be found under the

14   contrary to law provisions for dispensing, distributing or

15   possessing with the intent to distribute a controlled substance

16   under 841.  But dispensing is specifically defined as delivery

17   to the end user in the CSA, and of course, distributing or

18   possessing with the intent to distribute both have some element

19   of, you know, actual or constructive possession, something

20   that, of course, is not present when items are still in

21   international commerce.

22        So I think that 841 under either theory also suffers

23   from the same defect, that it's not illegal at the time of the

24   importation.  And the controlled substance, the CSA, does have

25   its own provisions for importing controlled substances.  21 USC

1    952 and 960 separately criminalizes importation.  So if

2    distribution or possession with the intent to distribute

3    occurred at the time of importation there would not really be

4    any need for those statutes.

5          So the government says, well, misbranding or not

6    having a prescription is not the only type of FDA violation we

7    intended this charge to cover, and the government says in its

8    papers we should be thinking about Count 1 as an offense to

9    conspiracy -- an offense to smuggle goods that are misbranded

10   because of all kinds of other regulatory problems.  They talk

11   about these drugs being unapproved, and therefore, illegal

12   under 331(d) when introduced into interstate commerce.  But

13   it's not what count 1 alleges.  I mean, Count 1 alleges

14   specifically misbranding under 331.  Misbranding violations are

15   found at 331(a), (b), (c), (g) and (k).  Unapproved drugs are

16   prohibited at 331(d).  They are different things, and that is

17   not what the indictment alleges.  Nothing defines unapproved

18   drugs as misbranded.

19         The government also says the drugs were misbranded

20   because § 352(f), involving inadequate directions for use, was

21   violated and that's misbranding.  Again, that's new.  That's

22   not alleged in the indictment.  There is nothing factually in

23   there that tells us that improper warnings were what the grand

24   jury considered or that we should be thinking about as

25   something that we need to defend at trial.

1          The same thing is true with the government's assertion

2     that the items were misbranded under 353(b)(4)(A) because they

3     did not bear the Rx symbol on them.  It's also new and not in

4     the indictment.  I think I counted 10 places in the indictment,

5     either in overt acts or the introduction or the substantive

6     parts of Count 1 where the indictment alleges that the

7     illegality of these drugs is that they were ordered without the

8     customers ever having to provide a prescription.

9          There is no indication that the grand jury thought of

10    any of these other theories or that we should be prepared to

11    defend against those things even if that now is what the

12    government says it may want to prove.

13          So those are my comments as they relate to Count 1.

14    Shall I move onto Count 2?

15          THE COURT:  Let me ask a couple questions about it

16    before you go to Count 2.  On the last point you raise, and I

17    am just looking at page 8 of the indictment, right above manner

18    and means.  It says, "The object of the conspiracy was to

19    import unapproved, foreign manufactured prescription drugs and

20    controlled anabolic steroids into the United States."  So I

21    recognize there is a lot of language in here about misbranding.

22    No prescription.  But that's a pretty generic object that would

23    seem to cover the other items the government says would be

24    responsible for contrary to law importation, including

25    unapproved foreign manufactured drugs --

1    MS. COBB:  Well, and as I read this, Your Honor, the §

2    545 offense, which is what they are alleging there was a

3    conspiracy to commit, that the agreement among the parties was

4    that they knew these drugs required prescriptions.  That is --

5    that is how I am reading the agreement, is the agreement was,

6    we are going to import drugs that require a prescription and we

7    are not going to ask for one, and I think that's what the

8    government should be tied to.

9        THE COURT:  -- okay.  More narrowly, one other item

10   that I think the government brought up in response on Count 1,

11   was, look, even if the Defense is right about the narrow

12   definition and sense of "dispense" as a downstream exchange to

13   an end user, it's still okay as we have pleaded it here because

14   the prohibited or contrary to law activity would include X, you

15   know, causing eventually that downstream handing off to an end

16   user without prescription.  And what's your response to that?

17       MS. COBB:  I think my response to that, Your Honor,

18   sort of relates to the fact that they -- that when you are

19   dealing with the smuggling offense itself and what makes it

20   contrary to law, it's not the overall agreement.  It's was the

21   thing illegal at the time it got to the border?  And I don't

22   know why the FDA code is written as it is.  I am -- I have not

23   sort I haven't gotten into it that far, but it is very specific

24   about dispensing drugs probably for all kinds of reasons

25   related to, you know, how many hands touch these things before

1    they are actually dispensed to a human being for consumption?

2    But that's the way they are -- they are written, and we -- the

3    statutes are very specific that they don't become misbranded

4    until they are being dispensed after shipment in interstate

5    commerce while being held for sale.

6                THE COURT:  Okay.  And why don't you go onto Count 2,

7    then, and let me get your position on that.

8                MS. COBB:  Yeah.  Count 2 -- and I have to be very

9    honest.  I have never seen money laundering charge this way, so

10   this was an interesting exercise for me that I probably spent

11   way more time on than I should have, but what the indictment

12   lists is planned transactions that constitute money laundering

13   conspiracy are already basically baked into this smuggling

14   conspiracy because they are listed as overt acts.

15               Paying suppliers and paying distributors and moving

16   money to make those payments are just part of the conspiracy

17   that's described in Count 1.  They are ordinary transactions

18   and expenses, which is exactly what Justice Scalia said in

19   Santos are the normal transactions of crimes for which there

20   shouldn't be a higher penalty for money laundering.  He said,

21   few crimes are free from costs and not all expenses are paid in

22   advance.

23               You know, it's one of these things if you look at in

24   this way, everything can be money laundering just like pretty

25   much every federal offense can also be a tax offense, right?

1   And so when that happens and the penalties for money laundering

2   is much higher, this Santos framework says the proceeds have to

3   be described as profits, and they weren't.  The government says

4   we are wrong about this for a whole bunch of different reasons,

5   but at the end of the day I think that all of its criticisms

6   are addressed in the cases that we have cited.

7          For example, the government says merger is never an

8   issue when concealment money laundering is charged.  That's

9   incorrect.  The two cases it cites to support that, Wilkes and

10  Buffin, they did analyze whether a charge of concealment money

11  laundering merged with a substantive offense ultimately finding

12  that they did not under the facts of the case but in no way

13  holding that concealment money laundering ever merges, just

14  that it didn't happen to there.  There are other cases cited in

15  the brief, I think in our brief, Meade and Jamison, where

16  concealment money laundering allegations are also discussed in

17  the context of merger.  So it may be that that is a less common

18  way for there to be a merger problem, but nothing holds that

19  concealment charges can't merge.  And really ultimately here, I

20  think because the money laundering conspiracy is charged under

21  both the concealment and promotional theories in a single

22  count, I mean, if either one merges that count is defective

23  because profits aren't alleged as to either theory.

24          The government, I believe, is also incorrect when it

25  states that the merger issue cannot be decided pretrial.  I get

1     it that most of these cases deal with a post-trial analysis,

2     and it does cite a number of out-of-state district courts for

3     this idea that it can't be decided pretrial, but obviously

4     those cases are of no precedential value, and more importantly,

5     they don't say that.  They are cases where those district

6     courts decided not to decide the merger issue pretrial, but

7     they didn't say that they couldn't.  And we cited in our brief

8     a Sixth Circuit case where the sufficiency of the indictment,

9     based on a potential merger problem, was addressed, and that's

10    the case of Meade.

11           I would also note that in one -- another one of the

12    cases in our brief, U.S. versus Olive, the Sixth Circuit stated

13    that whether to define proceeds or profits in any given case

14    should be known with certainty at the outset because it affects

15    charging, plea negotiations, trial strategy, jury instructions,

16    that kind of thing.  So clearly profits versus proceeds are

17    something the Sixth Circuit thinks should be defined properly

18    from the beginning, and I think the Court can do the same and

19    Rule 12 requires us to raise it.

20           And finally, the government is incorrect that the fact

21    that Count 1 charges a conspiracy means that there can be no

22    merger problem.  It says merger never arises in the context of

23    conspiracy, and that that is not right.  In the Crosgrove case

24    cited in our brief, also a Sixth Circuit case that has been

25    cited many times by the Sixth Circuit, there was merger of a

1    mail fraud conspiracy and a money laundering conspiracy because

2    the overt acts that the substantive conspiracy listed were the

3    same transactions the money laundering conspiracy was relying

4    on.  So what that case tells us is that, in our Sixth Circuit

5    at least, if planned financial transactions in a money

6    laundering conspiracy are listed as overt acts in the predicate

7    conspiracy, a merger problem can arise.

8         And we have the same thing here.  Payments to

9    co-conspirators for their participation in the scheme are

10   listed as overt acts.  Drugs being purchased from overseas

11   suppliers are listed in overt acts.  Transferring payments made

12   with traditional currency to cryptocurrency are listed in the

13   overt acts, and so we ask the Court to consider that under that

14   rational merger -- a merger problem is created here.

15        And then the last point I wanted to make, Your Honor,

16   a footnote in the government's brief says that all of the

17   laundered funds were indeed profits.  Now, obviously, it's not

18   allege that, and of course, there is no indication the grand

19   jury found that, but I would be interested to know if the

20   government is conceding or if the Court thinks that profits is

21   the proper way to measure proceeds here even if the count is

22   not going to be dismissed?  So that's all I have on that one,

23   Your Honor.

24        THE COURT:  Okay.  Thank you.

25        MS. COBB:  Thank you.

1      THE COURT:  We'll see if Mr. Gleeson has anything he

2   wants to add from the Defense perspective?

3      MR. GLEESON:  No, Your Honor.  Thank you for the

4   opportunity.

5      THE COURT:  Then we'll go to Ms. Carowan.

6      MS. CAROWAN:  Thank you, Your Honor.

7      So backing up first to Count 1, and I think it's

8   important, as the Court is well aware having read the parties'

9   briefing, to sort of look at what has to be in an indictment

10  for it to be sufficient?  It has to inform the Defendant of the

11  elements of the offense and essentially fairly inform him of

12  the charge that he is facing.

13     As the Supreme Court held in Hamling, the language of

14  the statute alone is usually sufficient for a charge to be

15  sufficiently pled.  In reviewing the indictment the Court takes

16  all of the allegations as true and makes all inferences in

17  favor of the government at this particular point.  The Court is

18  also encouraged to make more of a common sense review of the

19  indictment, rather than a more hyper technical review sort of

20  separating out individual paragraphs and things like that.

21     So with that in mind, looking at Count 1 in this case,

22  I think, first of all, it's important to point out it's charged

23  as conspiracy.  The essence of conspiracy is agreement.  Much

24  of what Ms. Cobb just said had to go to in large part if we had

25  charged her client with substantive drug smuggling.  That is

1    not what is charged.  What is charged is the agreement.  It

2    doesn't matter if that agreement is successful.  It doesn't

3    matter if the Defendant agreed with every part of that

4    conspiracy.  All you need is knowing agreement and an overt act

5    in furtherance of that agreement.

6            You have that as pled in Count 1 here.  It is -- it is

7    alleged as an agreement to smuggle misbranded, unapproved

8    foreign manufactured prescription drugs and controlled

9    substances into the country illegally in order to fulfill the

10   orders placed by customers on the Defendant's website,

11   expresspct.com.

12           And in preparation for today I actually went back and

13   looked at the charging language in Count 1 because that is

14   really what governs the analysis here, and again, it tracts the

15   language of the statute and what is required of conspiracy, and

16   it charges that the Defendants knowingly agreed.  It then talks

17   about what the object of that agreement was, which was here to

18   smuggle goods into the United States contrary to law.  It cites

19   the code section of that, which is 18 USC 545, and it doesn't

20   stop there.

21           That was sort of the problem in White, which was one

22   of the cases cited by Ms. Cobb, and that's not what we have

23   here, because it doesn't just say in contrary to 18 USC 545

24   contrary to law, figure it out.  It gives more information.  It

25   goes onto say misbranded prescription drugs.  It then says

1    controlled substances.

2         And then I think it's telling -- and Your Honor sort

3    of caught on this and I think that's important.  It says the

4    object of the conspiracy was to import unapproved foreign

5    manufactured prescription drugs and controlled anabolic

6    steroids.  That's the merchandise alleged to have been smuggled

7    as part of the agreement into the United States illegally.  And

8    then the indictment cites the statutes that make that very

9    merchandise contrary to law, and it refers both to 21 USC 841,

10   which is the illegal drug distribution and possession with

11   intent to distribute statute, and then it cites 21 USC 331.

12        Looking at all of this together, Your Honor, that is

13   what Hamling requires for Count 1 to be properly pled.  Right

14   there on page 8.  That is sufficient based on all the standards

15   at play here.

16        But Ms. Cobb and her client urge us to sort of look

17   into the facts, which ultimately ends up being a province for

18   the jury at the end of the day, but if we want to look at them,

19   it's fairly straightforward.  The multiple objects of the

20   conspiracy, controlled substances, misbranded prescription

21   drugs, and foreign manufactured and unapproved prescription

22   drugs.

23        841, despite Ms. Cobb's argument to the contrary, is

24   fairly straightforward.  It prohibits the possession with

25   intent to distribute and the distribution of controlled

substances.  It's fairly straightforward on its face what that
is, and as a result he didn't even challenge that in the
written motion.  There is nothing about the 841 reference that
is cited in Ms. Cobb's original filing to this Court saying
anything is wrong with the 841 citation.  That alone makes
Count 1 sufficient as pled.

It also cites 21 USC 331, which is, as I am sure the
Court is aware, a multipart statute.  There are many, many ways
and many prohibited acts codified under 331.  I went through it
this afternoon.  It goes from subpart (a) all the way to
subpart (ddd) are all of the prohibited acts that are
prohibited under 331.

The indictment cites 331 generally.  It doesn't say
this section specifically and only this section.  It cites 331
generally, so it's not limited to one subpart.

Before getting into the subparts that Ms. Cobb
addressed, I would point out the Court is absolutely right that
331 prohibits committing certain acts and also causing the
commission of those acts, and I don't think there is anything
in the indictment as pled that demonstrates anything but that
the Defendants were absolutely responsible for causing every
single step in this agreement from the agreement to the
shipping of the drugs from overseas, every single step in this
agreement.  So I think that's important because the causing
thereof is not in every single statute but it is here, and

1    because it's here it has to have meaning by itself.

2          Looking at the particular subsections of 331 that I

3    think both parties cited, 331(a) prohibits the introduction in

4    interstate commerce of a drug that is misbranded.  There are

5    many ways a drug can be misbranded.  One of those, which I'll

6    get to in a moment, is a drug that is dispensed without a

7    prescription, but there are other ways that a drug can be

8    misbranded as well, including not having proper labeling, not

9    indicating Rx only for example, and also just by the drug not

10   being approved by the FDA for distribution in the United

11   States.

12         And the drugs we are talking about here, to be fair,

13   are approved for distribution in the United States by a certain

14   U.S. based pharmaceutical manufacturer.  Eli Lilly, for

15   example, is allowed to distribute Cialis in the United States.

16   The FDA has received an application, has gone through its

17   testing and analysis and approved that.  What has not been

18   occurred -- what has not occurred, excuse me, is an approval by

19   the FDA for the foreign manufacturers here in India and other

20   places to distribute that same product here in the United

21   States but it's those foreign manufacturers where the

22   Defendants were getting their illegal product.  That

23   distribution of unapproved drugs is, in fact, sufficient

24   because of the labelling that's required enough to make those

25   drugs misbranded.

1          And finally, 331(k) when you dispense a prescription

2    drug without a prescription, that makes it misbranded while

3    held for sale.  Mr. Gagne and his counsel take this last

4    section and urge the Court to read it extremely narrowly to not

5    draw the inferences in favor of the United States and in favor

6    of the presumption of it being a valid indictment, but instead

7    to read it very, very narrowly to eventually say dispense is

8    only if I give the drugs to the end user.

9          I will agree with Ms. Cobb that giving the drugs,

10   dispensing the drugs to the end user is dispensing.

11   Absolutely.  But dispense should be looked at broader, and I

12   think the definition cited by both parties indicate that.  The

13   plain meaning of dispense is just to -- involves distribution.

14   It doesn't involve just distribution to one end user.  Here

15   there is multiple layers of the distribution from one person to

16   the other as part of the agreement.  And even the Controlled

17   Substances Act, which is the definition Ms. Cobb urges the

18   Court to adopt despite it being passed much later than the

19   Food, Drug and Cosmetic Act, includes packaging, labeling or

20   compounding necessary to prepare that substance for delivery.

21   Here all of those things happened before the drugs were ever

22   smuggled into the United States legally so that they could then

23   be further dispensed down the stream of commerce to the

24   ultimate consumer.

25          And again, Mr. Gagne and his co-conspirators

1    controlled every step of this process.  They weren't just one

2    cog in the wheel.  They were the wheel.  They created the

3    website.  They posted the drugs to the website.  They placed

4    orders to India and other foreign manufacturers for the drugs

5    that they posted for sale on their website.  They handled the

6    importation of those drugs to co-conspirators, and in fact,

7    managed to sort of decentralize that in order to not have those

8    drugs get flagged by customs.  They then handled the shipment

9    of those drugs to a second line distributor and then handled

10   the actual distribution from that second line distributor to

11   the customers, and then they handled the payment side of things

12   as well.  Every single step in this process was handled by the

13   co-conspirators.  For all of these reasons, Your Honor, Count 1

14   is sufficient as pled.

15             I don't know if the Court has any specific questions

16   about Count 1 before I move onto Count 2?

17             THE COURT:  So on Count 1, and this is not focused,

18   though, specifically on the motion to dismiss but the more

19   general concerns or issues that Ms. Cobb started with, because

20   even if I agree that Count 1 certainly survives the normal

21   pleading standard of fair notice and the like, at some point,

22   you know, the parties and the Court, we are going to have to

23   figure out what the theory is that gets presented to the jury.

24   And it's certainly true that prescription drugs or the lack of

25   prescription drugs comes up a lot more than anything else in

1    the Count 1 allegations.  The generic language that I

2    referenced on page 8 and a couple other places reference

3    foreign manufacturer.  So the first overt act says offering for

4    sale prescription drugs obtained from overseas pharmaceutical

5    companies without requiring the manufacturer to produce a

6    written prescription.  I think in the overt acts that's one of

7    the few places the overseas aspect is mentioned, and even there

8    it's linked with the lack of prescription.

9            Now, as I pointed out in questioning Ms. Cobb, your

10   generic statement of the object is broader than that.

11   Certainly covers unapproved foreign manufactured prescription

12   drugs.  But in terms of jury instructions, in terms of what the

13   Defense has to specifically prepare to meet and maybe even in

14   terms of whether the parties and eventually the jury or the

15   judge, if the judge gets to a conviction and sentencing, thinks

16   of this as more of a, you know, a regulatory problem, you know,

17   or a street drug distribution problem under Title 21, that's

18   the part that's a little unclear to me.  I am not sure it

19   affects the validity of the charge, you know, in a motion to

20   dismiss.

21           But that's -- that's the thing I guess I am zeroing in

22   on, and what I would hate to do is come to final pretrial and

23   then get a litany of a whole bunch of things the government

24   thinks are contrary to law, quote-unquote, whether under 331 or

25   841, beyond what's clearly articulated in the indictment, which

1    seems to focus on the prescription nature of the products and

2    the lack of prescription.

3            So I don't know if that directly addresses the motion

4    to dismiss as much as it does the practicalities of going

5    forward and preparing the case for trial, but I invite your

6    comments on it if you are able?

7            MS. CAROWAN:  Your Honor, I would point out that, yes,

8    the indictment does speak several times to prescription drugs

9    that were sold without a prescription.  Paragraph 11 of

10   introductory allegations also talk about the drugs being

11   manufactured outside of the United States, including in India,

12   for example.  So there are a number of other references, and

13   those introductory allegations are incorporated into Count 1 as

14   the first paragraph of Count 1.  So I would just point that

15   out.

16           As far as jury instructions, I mean, we'll obviously

17   have to kind of take that as it comes.  I will point out that

18   all of the theories of misbranding that we have talked about

19   this afternoon and that the government talked about as being

20   pled in the indictment are the subject of discovery.  So they

21   have been provided to Defense counsel as part of the discovery

22   that we have provided in this case in order to allow them to

23   prepare sufficiently for trial on that issue.

24           So I mean, it's very clear from the discovery, for

25   example, that the drugs at issue are not marked Rx only for

1  example.  So that is something as well certainly when we come

2  to crafting jury instructions I am sure the parties will have a

3  number of conversations hopefully well in advance of any

4  pretrial conference.

5       THE COURT:  All right.  Go ahead.  You want to address

6  Count 2?

7       MS. CAROWAN:  Thank you, Your Honor.

8       I found myself a little surprised, Your Honor, to hear

9  Ms. Cobb saying she's never seen money laundering pled like

10  this, because it's a fairly straightforward money laundering

11  conspiracy count.  You know, it's -- and again, we are talking

12  about conspiracy and I think that that is important.  It's

13  because, again, the essence of that is agreement, and when it

14  comes to money laundering conspiracy even less is required than

15  under 371 as charged in Count 1, and you just essentially need

16  agreement, the fact that the Defendant knowingly and

17  voluntarily joined that.  You don't need an overt act.  In

18  fact, you don't need a financial transaction.  You don't need

19  proceeds to allege a money laundering conspiracy.

20       So sort of going down this profits proceeds sort of

21  rabbit hole isn't necessary to decide whether Count 2 is

22  sufficiently pled.  It is sufficiently pled.  It does, again,

23  outline the elements of the statute and pleads two different

24  ways of violating the statute, both promotional money

25  laundering and concealment money laundering.

I would vehemently disagree with Ms. Cobb that if
either one of those merges the Count is invalid on its face.  I
think because it's pled in the alternative either one is
sufficient for that Count to be sufficiently pled and to go to
the jury.

That being said, I'll back up just a little bit.  Let
me start with concealment money laundering.  It doesn't
implicate merger.  Yes.  There are cases that talk about it.  I
don't recall seeing one that found concealment money laundering
emergencies.  And the reason it doesn't merge is that the
actions of concealment by and large happen after the
substantive SUA is complete.  It's not using proceeds or
profits, whatever word you want to use, to, you know, pay a
front on drugs or something.  It's separate and apart from the
SUA.  And that's how it's pled here.

Ms. Cobb says several times, oh, all of the -- all of
the steps in the -- in the money laundering conspiracy, all of
the concealment are affirmative acts or overt acts of Count 1,
and I frankly disagree with her.  There are a number of
concealment acts that occur, one of which is part of the drug
conspiracy where they talk about, hey, please don't put your --
anything specific on your payment that contract, just put your
order number.  Sure.  That's all part and parcel of the same
thing, but there is a lot that happens to that money after the
SUA is complete.  At that point it's routed through

1    payanywayexchange.com.  It is routed through the bank accounts
2    of Valiant Capital, which is essentially a sham company.  There
3    is not an office or workers or employees or anything.  That was
4    created by Mr. Funaro in part to funnel the money, to conceal
5    the money so it's run through Valiant Capital.  It then goes
6    through, in large part, Mr. Funaro's personal accounts where
7    it's moved to cryptocurrency exchanges, multiple cryptocurrency
8    exchanges.  Then it is -- then it is transferred into
9    cryptocurrency, and then it's shipped overseas to various
10   accounts.  All of those steps conceal the source, location,
11   ownership of the proceeds.  None of that has anything to do
12   with Count 1, and there is no merger.  The concealment part is
13   very, very straightforward from the government's perspective.
14   We cited Wilkes, which was cited plausibly by the Sixth Circuit
15   in Buffin for those very reasons.
16          Turning to the promotional money laundering.  Again, I
17   think things have been a little confused in the briefing.  This
18   is not a situation where the drugs were obtained on front, as
19   you would see sort of in a normal typical 841, 846 drug
20   trafficking conspiracy where Co-Conspirator A gets a pile of
21   methamphetamine for free essentially initially.  Rather than
22   paying for it goes and sells it, gets $50,000, and takes it
23   back to his source of supply to pay for the $50,000 worth of
24   methamphetamine he got on front.
25          If that were what was alleged then maybe there would

be a merger problem.  That's not what is alleged.  That's not what happened here.  What happened here is the co-conspirators paid for the drugs they ordered.  They ordered drugs through Indian pharmaceutical companies and other pharmaceutical companies and paid for them.  They imported those illegally contrary to law into the United States so that they could be ultimately routed to consumers.  They got the money for those and then took the money and reinvested it in more drugs, thus continuing the conspiracy.

That's different than paying a supplier on front. That's what the cases that we cited in our brief where it talked about, you know, we were going to use the proceeds of meth trafficking to start a marijuana business.  The fact that it's, you know, some of the same drugs is irrelevant.  It's not all of the same drugs and they weren't repaying a debt.  They were paying to continue the conspiracy, and that's separate and apart.  That's not a merger problem under -- for the purposes of promotional money laundering.

I will point out I think it's premature to have the discussion about merger as it relates to the promotional money laundering because there are a lot of facts that would be presented to the jury ultimately, and I think those would be something that should be considered rather than deciding it at this early stage, but to the extent the Court takes it up at this stage I think it is sufficiently pled.  There is not a

1    merger issue as it is pled.  They are not defraying expenses of

2    the conspiracy.  They are, in fact, reengaging in a new

3    conspiracy and a new set of smuggling of drugs illegally, and

4    that is not a merger issue as laid out in the case law as cited

5    in our briefing.

6              Does the Court have any questions on Count 2?

7              THE COURT:  I don't think I do right now.  Thank you.

8              MS. CAROWAN:  Thank you.

9              THE COURT:  Ms. Cobb, do you have any rebuttal?

10             MS. COBB:  I am concerned that the government is not

11   able to articulate a theory for Count 1.  The agreement listed

12   in the indictment is the agreement to smuggle misbranded drugs.

13   There are 10 places in the indictment where bringing drugs into

14   the country without a prescription is mentioned.  The Court

15   mentioned a couple of them.  Paragraph 1 and 2 of the overt

16   acts specifically tie the out-of-country aspect of this to no

17   prescription.  Paragraphs 1 and 2 of the introduction do the

18   same thing.

19             The object of the conspiracy is different from the

20   agreement.  There is not going to be an instruction to a jury

21   about the object.  It's going to be, did they agree to smuggle

22   based on misbranding in violation of 331 or 841?  The object

23   isn't going to come into play.

24             And I think that if there is any good indication that

25   the government's theory is a moving target on Count 1, the fact

1    that it can't answer a very direct question is probably the

2    best evidence of that.

3          And as for the money laundering, Your Honor, again, I

4    think, and Ms. Carowan didn't address this, but you know, if

5    the promotional prong merges, the whole Count is defective, and

6    that clearly that promotional prong as alleged, those are

7    absolutely squarely addressed in the overt acts of the

8    smuggling conspiracy.

9          That's all I have.  Thank you.

10          THE COURT:  All right.  Well, thank you to the

11    parties.

12          We don't get a lot of motions to dismiss an indictment

13    based on failure of the government to allege a crime, because

14    frankly, the standards under Rule 7 for stating sufficient

15    charge are pretty -- pretty general, pretty easy to meet.

16          I think the parties both agree Hamling against the

17    United States, 418 US 87, 1974, would provide the main

18    elements.  There has to be, of course, a recital of the core

19    elements of the crime charged, which in this case are two

20    conspiracies.  There needs to be fair notice of what is at

21    issue, which I think the Defense suggests maybe there isn't

22    here, and then there needs to be enough specificity so that the

23    Defense could later plead either an acquittal or a conviction

24    if necessary as a bar to subsequent prosecutions.

25          The government and Ms. Carowan points out that

1    particularly in the case of a conspiracy charge the level of
2    specificity certainly needs to articulate an agreement that if
3    it was made was unlawful but doesn't necessarily meet all the
4    same level of technical detail that you'd expect if there was a
5    charge of the underlying criminal activity itself, and I think
6    she cites the Fruehauf Corporation decision from the Sixth
7    Circuit for that, 577 F.2d 1038.

8         The Defense suggests that Count 1 is not sufficient to
9    state the crime of a conspiracy to smuggle.  And I think
10   everybody agrees when we are talking about a conspiracy, at
11   least the conspiracy to smuggle, which is what Count 1 is
12   subject to, there needs to be, first of all, of course, an
13   agreement.  That's the core of any conspiracy claim.  And
14   secondly, proof that the Defendant joined the conspiracy, and
15   then in this case, smuggling conspiracy there would need to be
16   an overt act.

17        What I hear the Defense saying is, look, smuggling
18   conspiracy requires us and requires ultimately the government
19   to prove that there was a knowing importing into the country of
20   some merchandise that was done "contrary to law".  That's
21   really the focal point of the dispute between the parties.

22        As a matter of whether or not the indictment states a
23   crime, I think the government has the better of the argument
24   and I will deny the Defense motion to dismiss Count 1 because I
25   think the indictment does fairly allege a conspiracy that

1    involved an agreement to smuggle within the meaning of the

2    applicable statute.  I think it's 545, but I might have that

3    section wrong.  In any case, the elements would require what I

4    said before, namely, the knowing importation of merchandise

5    into the country "contrary to law".

6        It's certainly true, as I indicated in my comments to

7    both sides, that there is a lot of language in the generic

8    background, in the description of the smuggling conspiracy

9    itself, that talk about prescription drugs, the need for

10   prescription and the lack of prescription, but I do think you

11   have to figure out what the government's theory is giving the

12   government the benefit of reasonable inference from what it

13   generically charges, and the most generic statement of the

14   charge that I see is the one I cited to Ms. Cobb toward the

15   bottom of page 8 where it says, "The object of the conspiracy

16   was to import unapproved foreign manufactured prescription

17   drugs and controlled anabolic steroids into the United States."

18       That's a pretty broad umbrella.  I grant you that.

19   But the nature of most criminal indictments is broad umbrellas.

20   And under that umbrella, for sure the prescription drug aspect

21   that is later detailed in many of the overt acts and that is

22   earlier described in the indictment in the background language,

23   seemingly to focus on prescription is one way the government

24   can make out the charge here that it's made against the

25   Defendants if the proofs support it.

1          But I don't see that that limits the government from

2    relying on other theories that are within fair notice of the

3    documents, and right above the language that I have just quoted

4    the government specifically cites not just the smuggling

5    statute, which is Title 18, 545, but also, both the § 341 and

6    841 of Title 21 suggesting that the mere fact that these are

7    controlled substances, if that's what the proofs show, if they

8    were knowingly imported, would be enough to support the

9    conspiracy charge, and that there would also be other aspects

10   of potential misbranding or potential contrary to law

11   importation under any applicable section of 331.  I don't think

12   anything requires the government to specify every possible

13   theory in the indictment even when it chooses to get specific

14   as to some.

15          As a practical matter, if the case proceeds to trial

16   we are going to have to get focused on that.  Both sides will.

17   Maybe it's the kind of case where we need to have a final

18   pretrial with trial briefs and the like farther in advance of

19   trial than we ordinarily would to make sure we are all on the

20   same page, but I don't think it rises to the level of a defect

21   in the pleading instrument itself here, the indictment.

22          One other aspect on the Count 1 smuggling conspiracy.

23   The focal -- even sticking just for a moment with the Defense

24   view that really all Count 1 fairly charges is a contrary to

25   law element tied to the dispensing of prescription drug without

1     a prescription, let's take that for purposes of argument, and I
2     don't think it's fair to limit the government's charge to that,
3     but if it were, I still don't think the Defense would have a
4     basis to dismiss this indictment because as I indicated, the
5     language of the statute here does include causing this to
6     happen.  So even if dispensing downstream to an end user
7     without a prescription, you know, obviously can't happen until
8     the goods are inside the United States.  It would still mean
9     that if the agency includes Defendants, if the way the drugs
10    got into the United States in the first place on their
11    inevitable way downstream to the dispensing without a
12    prescription is proven to a jury's satisfaction to involve this
13    Defendant or these Defendants' activities, then I think that
14    would be sufficient to support a conviction for the smuggling
15    conspiracy charge.
16            So bottom line from my perspective is, I don't think
17    that there is a basis to dismiss the charge in Count 1.  I
18    think the general Rule 7 pleading standards are satisfied.
19    There will have to be some narrowing, tailoring, and focusing
20    for trial, and if there is a conviction there certainly will be
21    disputes among the parties as to what the propriety of, you
22    know, guideline determinations are, but that's all downstream.
23    That's not here today as a basis to dismiss Count 1 in my
24    opinion.
25            Count 2 is a money laundering conspiracy.  So once

1    again, we have the conspiracy elements, an agreement here

2    joined by the Defendants, and I think Ms. Carowan is right that

3    in the case of the money laundering conspiracy the statute

4    provides an independent wrong -- as an independent wrong than

5    money laundering conspiracy itself, so I don't think we'd have

6    an overt act requirement there.

7         And here, like Ms. Cobb I guess, I was intrigued by

8    the Santos crowd issue because I don't think I've had that come

9    up specifically for me in prior litigation either.  But before

10   we get to that, specifically with respect to this charge --

11   well, I guess, we can in effect get to go it.  Let's start with

12   the concealment prong.

13        I think the government can rely for Count -- the Count

14   2 conspiracy on either promotional money laundering or

15   concealment money laundering.  I think either one is available

16   because that's the way the government pleaded it, and we are

17   talking here about a conspiracy charge.  So as long as the jury

18   is satisfied that there is either concealment or promotional

19   money laundering as the object of the unlawful agreement there

20   could be a basis to convict.

21        Now, with respect to concealment, first of all, I

22   don't think -- and I think Ms. Carowan effectively recognizes

23   this, that there is not an automatic matter of law rule out

24   there, certainly not in the Sixth Circuit, that says if it's

25   concealment money laundering there can't be a merger problem.

But as a practical matter, it's hard to imagine a situation where there would be a merger problem for the reason she articulates.  Namely, that in most concealment situations you are dealing with alleged activity well after the underlying unlawful activity was completed or occurred.  Here the smuggling the drugs from overseas into the country and the concealment alleged includes things like funneling money through different accounts to hide its true source.

That can't possibly be a merger problem in my view because even though the account itself might incorporate earlier allegations that deal with the smuggling conspiracy, the fact or the concealment aspect of the money laundering conspiracy would all involve activity well downstream from the underlying offense.

So you have necessarily, it seems to me, on the concealment theory alleged here, separate offenses, and even if the underlying penalties are different for concealment money laundering conspiracy, than for a smuggling conspiracy under 371, you don't ever get to that point under Santos-Kratt because there is really not a merger problem from a factual point of view.

The promotional aspect or the promotional theory of the money laundering conspiracy is a little different.  I think there could be a Santos-Kratt issue in a promotional theory like this, but at least the way the government alleges things,

1    and that will ultimately be a matter of proofs, the gross

2    revenue achieved from the sale of the goods was used to

3    purchase new smuggled goods, not pay for the original ones, and

4    if that's what the proofs show and that's what the government

5    theory develops, then there isn't, in my mind, a Santos-Kratt

6    problem because once again, you are dealing not with simply

7    completing or closing the loop of the original underlying

8    unlawful activity, but dealing with, you know, new activation

9    of yet a new round of drug sales.

10          So I don't think from what we've heard described here,

11   what we see described in the government's papers, there is a

12   Santos-Kratt problem even with the promotional prong.  Even if

13   there were a problem with the promotional prong, I do agree

14   with the government that in a money laundering conspiracy

15   charge, either concealment or promotional proofs would be

16   sufficient to support a conviction.  So I don't -- I don't

17   think that's a problem the government has to worry about and

18   I'll have to worry along with the parties downstream about what

19   the proofs show to decide whether there is ultimately a

20   Santos-Kratt problem on the promotional prong.

21          One sort of footnote on that, it's an interesting

22   point the government makes in its briefing.  Didn't address so

23   much here today, but you know, can conceal -- charges of

24   conspiracy as opposed to a charge and conviction on the

25   underlying wrong itself really ever create a merger problem?

1    And in theory you'd think, well, probably not, because after

2    all, the independent wrong of the conspiracy is joining the

3    unlawful agreement itself.  That said, I do agree with Ms. Cobb

4    that the Crosgrove decision she cited from the Sixth Circuit, I

5    don't know if I have that cite right handy, but the Crosgrove

6    decision, 637 F.3d 646, does involve Santos-Kratt analysis of

7    two conspiracies.  So it was a new -- Santos was a brand new

8    case at the time Crosgrove was decided.  Maybe that affects

9    things, but that alone would not lead me automatically as a

10   matter of law to say you couldn't have an issue.

11           I just think at this stage of the case on a motion to

12   dismiss there is no basis to grant that motion.  I think the

13   government's charging document is sufficient to state crimes,

14   if, in fact, the proofs are developed as the government expects

15   and the jury accepts that.  So for those reasons I do deny the

16   Defense motion as well as Mr. Ford's motion to join as to Count

17   1, so the case can proceed and we'll simply enter an order to

18   that effect.

19           Are there other things that would be helpful to do

20   today from the government's perspective?

21           MS. CAROWAN:  May I have a moment, Your Honor?

22           THE COURT:  Sure.  Of course.

23           MS. CAROWAN:  Thank you.

24           The only thing I might just point -- the Court raised

25   the timing of the final pretrial.  I think currently the matter

1    is set for trial November 15th.  I don't have the final

2    pretrial date at immediate recall without my calendar.  I am

3    set actually to be in trial before another court before Judge

4    Neff on October 18th, but other than that I am fairly

5    available.  I don't know if the Court wants to address that or

6    wants to address the trial date in light of the complicated

7    nature of the issues as well.

8          THE COURT:  All right.  Yeah.  I don't have the date

9    in front of me either.

10          MS. COBB:  I don't have it in front of me.

11          THE COURT:  I am looking it up.

12          MR. GLEESON:  Your Honor, if I may, I believe it's

13   October 31st.

14          THE COURT:  Anything else that would be helpful from

15   the Defense perspective today?

16          MS. COBB:  May I have just one moment, Your Honor?

17          THE COURT:  Sure.  Sure.

18          MS. COBB:  I don't have anything, Your Honor.  Thank

19   you.

20          THE COURT:  All right.

21          MR. GLEESON:  Nothing, Your Honor.  Thank you.

22          THE COURT:  Okay.  Let me follow up, then, on the

23   timing issue.  With an October 31 final pretrial date and

24   November 15 trial date, we have effectively got two weeks,

25   which is pretty normal.  That may or may not be enough for a

1    case like this.  From the parties' perspective, and I'll start

2    with the Defense I guess, would you like, you know, more like

3    three weeks, four weeks between final pretrial and trial or is

4    that not really an issue from your perspective?

5        MS. COBB:  Well, I think my concern about doing that

6    is that we get dangerously close to the government's plea

7    cutoff date, which I think is two weeks prior to the final

8    pretrial.  So we were already getting a little bit close to

9    that anyway, and that would be my -- that would be my main

10   concern is starting to back it up, backs us into we got to

11   decide about pleading guilty today, which, I mean, certainly is

12   something we have discussed, but I am not sensing that there is

13   a feeling like that's what we want to do right now.

14       THE COURT:  Right.  Well, I certainly wouldn't want to

15   put somebody in a position to have to decide that right away.

16       MS. COBB:  Right.  So I am open to what Ms. Carowan

17   thinks or what Mr. Gleeson thinks.

18       THE COURT:  Why don't we do this.  I wasn't even sure

19   if I was going to rule today or take things under advisement.

20   The parties don't know that for sure either.  When there is a

21   trial scheduled I try a little harder sometimes to rule from

22   the bench so we don't necessarily interrupt that.  But it may

23   be one of those cases where even if there is a ruling on a

24   motion to dismiss like this, there is things that both sides

25   want to talk about in order to satisfy themselves they are

1   ready to go to trial, and if that's the case and you need more
2   time we don't have any Defendant in custody.  So in terms of
3   getting the parties the time they need to evaluate it's about
4   as easy an array of facts as we can imagine.  You know, I
5   always worry about somebody in custody.  Of course, even when
6   you are not in custody you are under a cloud.  I get that.  And
7   you want to move forward.  But by the same token, it's not like
8   sitting in Newaygo.  So there is -- if time is essential I'll
9   wait for the parties to tell me that and we'll make
10  adjustments, but you should all realize this is the kind of
11  case where that would make sense to me if the parties all agree
12  that that's in the service of justice.  But you don't have to
13  decide that today either and you'd probably need some time to
14  chew on it.  Think about it.
15          MS. CAROWAN:  Thank you, Your Honor.
16          THE COURT:  Unless there's anything from the parties
17  I'll let you go and I'll wait to hear from you if and when
18  there is something you need from me before final pretrial.
19          MS. CAROWAN:  Nothing further, Your Honor.  Thank you.
20          MS. COBB:  Thank you.
21          THE COURT:  Mr. Gleeson?
22          MR. GLEESON:  Thank you, Your Honor.  Nothing further,
23  Your Honor.  Thank you.
24          LAW CLERK:  Court is adjourned.
25          (Proceeding concluded, 4:05 p.m.)

1                        REPORTER'S CERTIFICATE

2

3          I, Paul G. Brandell, Official Court Reporter for the

4   United States District Court for the Western District of

5   Michigan, appointed pursuant to the provisions of Title 28,

6   United States Code, Section 753, do hereby certify that the

7   foregoing is a full, true and correct transcript of the

8   proceedings had in the within entitled and numbered cause on

9   the date hereinbefore set forth; and I do further certify that

10  the foregoing transcript has been prepared by me or under my

11  direction.

12

13

14                      /s/ Paul G. Brandell

15                      Paul G. Brandell, CSR-4552, RPR, CRR

16                      U.S. District Court Reporter

17                      399 Federal Building

18                      Grand Rapids, Michigan  49503

19

20

21

22

23

24

25